CASE NO. 21-1899

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**
_____

EDNA FORDHAM
Petitioner,
v.
UNITED STATES DEPARTMENT OF LABOR and
MARTY J. WALSH, Secretary
Respondents.

_____

**OPENING BRIEF OF PETITIONER**
**ON PETITION FOR REVIEW OF AN ORDER OF**
**THE UNITED STATES DEPARTMENT OF LABOR**
(2021-0029)

Thad M. Guyer
Stephani L. Ayers
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501

Of Counsel for Government Accountability Project, Inc.
Washington, DC

Counsel for Petitioner

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-1899       Caption: Fordham v. United States Department of Labor

Pursuant to FRAP 26.1 and Local Rule 26.1,

Edna Fordham
_____
(name of party/amicus)

_____

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                  ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Thad M. Guyer _____     Date: _____09-15-2021_____

Counsel for: Petitioner _____

# TABLE OF CONTENTS

I.   DISCLOSURE STATEMENT FORM ..........................................................7

II.  JURISDICTIONAL STATEMENT ...........................................................7

III. ISSUES PRESENTED FOR REVIEW ........................................................7

IV.  STATEMENT OF THE CASE .................................................................8

   A.  Relevant Procedural History: .......................................................8

   B.  Rulings Presented for Review: ....................................................10

   C.  Facts Relevant to the Issues Submitted for Review" ....................11

V.   SUMMARY OF THE ARGUMENT .........................................................17

## ARGUMENT

VI.  THE STANDARDS OF JUDICIAL REVIEW APPLICABLE TO THE
UNIQUE AND TROUBLED HISTORY OF THIS CASE JUSTIFY
WITHHOLDING TYPICAL DEFERENCE TO THE AGENCY
DECISIONMAKING ..............................................................................19

   A.  Standard of Review in this Court: ...............................................19

   B.  This Court's Review of Fact Findings Depends on the Degree of ALJ Legal
   Error and Lapses of Adjudicatory Duties on the Issues: ...................21

   C.  This Court and the ARB May Defer Only to Credibility Findings Expressly
   Based on Witness Demeanor, which the Third ALJ Could not Make in this Case:
   26

   D.  Law of the Case Doctrine Constricted Allowable Findings and Conclusions
   by the Third ALJ: ...........................................................................28

VII. THE ARB'S AFFIRMANCE OF THE THIRD ALJ'S FINAL DECISION
AND ORDER WAS ARBITRARY, NOT BASED ON SUBSTANTIAL
EVIDENCE NOR IN ACCORDANCE WITH LAW ...........................28

   A.  This Court Should Apply an Enhanced Standard of Review of the Agency's
   Acceptance of the Clear and Convincing Evidence Same Action Defense.........28

B.   Because Neither the 2021 ALJ nor the 2021 ARB Engaged in Speegle, Carr or Any Other Structure Legal Analysis of the Same Action Defense, this Court's Reasonable Mind Cannot Accept the Agency Dismissal of this Case.................29

C.   Administrative Leave (aka Administrative Suspension): ............................33

D.   Termination Following the Administrative Leave:........................................42

E.   The ALJ's Conclusion on Clear and Convincing Evidence is Plainly Erroneous, and Based on Ignoring the 2014 ARB Remand Order ....................44

VIII.   CONCLUSION .........................................................................................48

IX.   STATEMENT REGARDING ORAL ARGUMENT ...................................50

X.   CERTIFICATE OF COMPLIANCE ...............................................................51

XI.   CERTIFICATE OF SERVICE ....................................................................52

# TABLE OF AUHTORITIES

NO TABLE OF AUTHORITIES ENTRIES FOUND.**FOURTH CIRCUIT CASES**

Donnelly Corp. v. Gentex Corp., 913 F. Supp. 1014, 1020 (W.D. Mich. 1995). ...48

*Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ......................................22

*Middle E. Broad. Networks, Inc. v. MBI Glob., LLC*, 689 F. App'x 155, 160 (4th Cir. 2017). ...........................................................................................................22

*Rawl v. United States*, 778 F.2d 1009, 1014 (4th Cir. 1985), *cert. denied*, 479 U.S. 814, 93 L. Ed. 2d 25, 107 S. Ct. 67 (1986) ...........................................................21

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984)...........................................22

*Shively, id. at* 989 (4th Cir. 1984) ........................................................................25

*Smith v. DOL*, 674 Fed. Appx. 309, 315 (4th Cir. 2017) ........................................32

*Thomas v. Gen. Ship Repair Corp.*, 585 Fed. Appx. 164, 164-165 (4th Cir. 2014)26

*United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 334 (4th Cir. 1996) .................................................................................21

*United States v. Holcomb*, 651 F.2d 231, 236 (4th Cir. 1981) ...............................21

*Va. Agric. Growers Ass'n v. Donovan*, 774 F.2d 89, 92-93 (4th Cir. 1985). ..........21

Welch v. Chao, 536 F.3d 269, 275-76 (4th Cir. 2008)...........................................19

## ARB CASES

*Baiju v. Fifth Avenue Committee*, ARB CASE NO. 10-094; 2012 DOL Ad. Rev. Bd. LEXIS 33 (DOL Ad. Rev. Bd. 2012)...............................................................22

*Barrett v. E-Smart Technologies, Inc*., 2011 DOLSOX LEXIS 64, pp. 96-97,ALJ No. 2010-SOX-00031 (September 9, 2011): ............................................... 47-48

*DeFrancesco v. Union R.R. Co.*, ARB No. 13-057, ALJ No. 2009-FRS- 009, slip op. at 8 (ARB Sept. 30,2015) ............................................................................44

*Fordham v. Fannie Mae,* ARB No. 12-061, ALJ No. 2010-SOX-00051 (ARB Oct. 9, 2014) .................................................................................................................9

*Gatto v. General Utilities*, ALJ No. 2018-STA-00003, slip op. at 4 (OALJ November 1, 2018) .................................................................................................43

*Hall v. U.S. Army Dugway Proving Ground*, ARB CASE NOS. 02-108, 2004 DOL Ad. Rev. Bd. LEXIS 335, 79-80 (DOL Ad. Rev. Bd. 2004) ................................25

*Johnson v. Roadway Express, Inc*., 2002 DOL Ad. Rev. Bd. LEXIS 67, ARB Case No. 01-013, ALJ Case No. 99-STA 5 (2002) ....................................................28

*Lancaster v. Norfolk S. Ry. Co.*, ARB No. 2019-0048, ALJ No. 2018-FRS-00032, slip op. at 8 (ARB Feb.25, 2021).......................................................................44

*Luder v. Continental Airlines, Inc*., ARB CASE NO. 10-026, 2012 DOL Ad. Rev. Bd. LEXIS 11 (DOL Ad. Rev. Bd. 2012).....................................................21, 22

Please make your own decision and then he said that versionThanks*Menendez v. Halliburton, Inc*., ARB CASE NOS. 09-002, 2011 DOL Ad. Rev. Bd. LEXIS 83, 17-18 (DOL Ad. Rev. Bd. 2011)          23

*Palmer v. Canadian Nat'l Ry.,* ARB No. 16-035, ALJ No. 2014-FRS-154 (ARB Sept. 30, 2016) (reissued with full dissent, Jan. 4, 2017) .....................................9

*Price v. Symsek, id.* at 1191(citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1983)..................................................................................................................48

*Ruud v. Westinghouse Hanford Co*., No. 1988-ERA-33, ALJ RD&O on Remand, Dec. 8, 1988 ...................................................................................................28

*Salata v. City Concrete, LLC*, ARB CASE NOS. 08-101, 2011 DOL Ad. Rev. Bd. LEXIS 88 (DOL Ad. Rev. Bd. 2011) ...............................................................23

*Stephenson v. NASA*, 2000 DOL Ad. Rev. Bd. LEXIS 78, ARB Case No. 98-025, ALJ Case No. 94-TSC-5 (2000), ........................................................................27

*Svendsen v. Air Methods, Inc*., ARB CASE NO. 03-074, 2004 DOL Ad. Rev. Bd. LEXIS 201, 10-12 (DOL Ad. Rev. Bd. 2004) ....................................................26

## OTHER FEDERAL COURT CASES

*Ahmed v. Lynch*, 804 F.3d 237, 240 (2nd Cir. 2015), quoting *Francis v. Gonzales*, 442 F.3d 131, 138 (2d Cir. 2006) ......................................................................28

*Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 770 (1st Cir. 1994 .................................................................................................................27

*Donnelly Corp. v. Gentex Corp*., 913 F. Supp. 1014, 1020 (W.D. Mich. 1995).....47

*Field v. Mans*, 157 F. 3d 35, 40 (1st Cir. 1998) ......................................................27

*Price v. Symsek*, 988 F.2d 1187, 1192 (Fed. Cir. 1993).........................................46

*Rav Truck & Trailer Repairs v. NLRB*, 997 F.3d 314, 328 (D.C. Cir. 2021). ........20

*Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997) .31

*Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 U.S. Dist. LEXIS 2548
  (C.D. Cal. Jan. 11, 2011) .......................................................................47

**STATUTES**

18 U.S.C. § 1514A(b)(2)(C).......................................................................42

5 U.S.C. § 706 ...........................................................................................6

5 U.S.C. § 706(2)(A) ................................................................................18

**REGULATIONS**

20 C.F.R. § 655.845 ..................................................................................23

29 C.F.R. § 1980.109(b)............................................................................42

29 CFR 1980.110(b)..................................................................................21

## I.    DISCLOSURE STATEMENT FORM

See above.

## II.    JURISDICTIONAL STATEMENT

This is a Sarbanes Oxley Act ("SOX") whistleblower case under 18 U.S.C. § 1514A.  Pursuant to § 1514A(b)(1), the Secretary of Labor has jurisdiction over employee complaints of retaliation that are filed within 180 days of a violation. The Administrative Review Board of the Department of Labor ("ARB") ruled against Petitioner by final decision and order dated July 19, 2021, disposing of all claims between all parties. The ARB found all time limitation and procedural requirements had been met.  This Court reviews the ARB's decisions pursuant to the standard established in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  A petition for review was filed in this Court on August 13, 2021, within the 30 days' time limitation.

## III.    ISSUES PRESENTED FOR REVIEW

(1) Did the ARB err in concluding that the employer Fannie Mae had proven its affirmative defense by clear and convincing evidence that, despite the contributing factor of the employer considering Petitioner's protected activity, it would have suspended and terminated her when it did and for the non-discriminatory reasons it claimed?

(2) Did the ARB err in not reviewing the facts of the affirmative defense de novo given that the ALJ whom it affirmed had not been the hearing judge, and the

7

hearing judge whom he replaced had dismissed the complaint without ever

adjudicating the affirmative defense?

## IV.  STATEMENT OF THE CASE

### A. <u>Relevant Procedural History:</u>

Two and a half years into her DOL journey, on March 19, 2012 [JA0029],

the first ALJ issued a Decision and Order dismissing the complaint, finding that

while Complainant had engaged in protected activity and suffered adverse personnel

actions of involuntary administrative leave and termination, that protected activity

did not contribute to the adverse actions taken against her.  The first ALJ declined

to address Fannie Mae's affirmative defense of non-retaliatory reasons for the

adverse actions.

Complainant appealed to the ARB, and on October 9, 2014 [JA 0161], the

ARB reversed and remanded the ALJ's conclusion that contributing factor had not

been proven.  First, the ARB found that the ALJ had ignored incontrovertible

evidence contradicting Fannie Mae's assertions that prior to the decisions placing

her on involuntary administrative leave and firing her, it had no knowledge of

Complainant's filings with the Securities Exchange Commission and Federal

Housing Finance Agency.  Second, the ARB rendered a short-lived but farsighted

opinion that the ALJ's erroneous contributing factor conclusion was based on

commingled evidence, i.e., that an ALJ cannot by using the contributing factor

evidentiary standard of preponderance of the evidence effectively accept the

employer's non-retaliatory discharge defense without requiring proof of that

defense by clear and convincing evidence.

Between the first and second ALJs, the Secretary did nothing with the remand

for two years.  After two years, a split ARB then overruled the anti-commingling

of evidence precedent of *Fordham v. Fannie Mae,* ARB No. 12-061, ALJ No.

2010-SOX-00051 (ARB Oct. 9, 2014) with the superseding decision on September

30, 2016, of *Palmer v. Canadian Nat'l Ry.,* ARB No. 16-035, ALJ No. 2014-FRS-

154 (ARB Sept. 30, 2016) (reissued with full dissent, Jan. 4, 2017).  The case was

then reassigned to the third ALJ, who took no action for eight more months.  When

he did, he was bound by the 2014 ARB holding that "substantial evidence of record

does not support the ALJ's finding that Fannie Mae's decision to terminate

Fordham's employment was made prior to Fordham's protected activities of April

23-27, 2009."  Therefore, the third ALJ on March 31, 2021 [JA 0216] concluded

that Complainant had established that her protected activity was a contributing

factor to both the involuntary administrative leave and the termination.  This

effectively overruled the first ALJ on both her contributing factor and affirmative

defense dispositions at page 127, n. 16 of the March 19, 2012 Order [JA 0156]:

> Since I have determined that Complainant's discrimination complaint
> must be dismissed because she has failed to prove that her protected
> activity contributed to adverse actions taken against her, I need not

9

address whether the Respondents would have terminated her employment in the absence of her protected activity.

This then left a single issue for the third ALJ to adjudicate: Did Fannie Mae prove by clear and convincing evidence that it would have terminated Ms. Fordham despite her protected activity having contributed to that decision? He answered yes. Thus, Petitioner filed her second petition for review to the ARB on the grounds that the third ALJ erred (1) in concluding that Fannie Mae had sustained its non-retaliatory reasons affirmative defense by clear and convincing evidence; and (2) by reaching that conclusion based on the first ALJ's erroneous factual analysis under contributing factor, and without examining the entire factual record. She argued to the 2021 ARB that because the first ALJ in 2012 had never reached the merits of the affirmative defense, and because the third ALJ nine years later did not examine the whole factual record or make independent factual or credibility findings, his decision was not entitled to deference and was therefore before the ARB de novo.

**B. Rulings Presented for Review:**

The July 19, 2021 ARB [JA 0244] decision simply adopted the third ALJ's dismissal order of March 31, 2021 [JA 0216]. Given that the third ALJ relied only upon the fact findings of the first ALJ on contributing factor, which were in error and rejected by the 2014 ARB, and not upon any credibility determinations or

review of the entire record, this Court must decide whether the March 31, 2021

decision must also be accepted.

## C. Facts Relevant to the Issues Submitted for Review

The following fact findings and ultimate fact conclusions at pp. 21-24 of the

March 31, 2021 [JA 0236-JA 0239], are those this Court must scrutinize:

> Applying that standard here, Fordham's work record and the "full timeline of the events" clearly and convincingly establishes that Fannie Mae would have taken the same adverse actions in the absence of Fordham's protected activities.

> With respect to the adverse actions of the lowered performance evaluation and memorandum of concern, Fordham's persistent performance, conduct, and attendance issues from mid-2008 through February 2009 makes it highly probable that Fannie Mae would have taken those same adverse actions in the absence of Fordham's protected activity. That is, Fordham's work record during that timeframe conclusively demonstrates that Fannie Mae would have still given Fordham a lower performance rating and memorandum of concern in the absence of the *December II* protected activity.

> Starting in around mid-2008 and continuing, Fordham failed to attend meetings, was late to meetings, did not participate during meetings when she was present, surfed the internet during meetings, failed to timely respond to requests, sent emails that were inappropriate and unprofessional in tone, and submitted a substandard work product for an employee at her level. Fordham was counseled regarding these issues, but to no avail. By November 2008, these same issues were recurring and caused her manager, Hall, to inform human resources that Fordham was not performing strongly and therefore would likely receive a low performance rating.
> ***
> The fact that Hall was aware of the *December II* protected activity at the time of the performance review and memorandum of concern does not reduce the high probability that Fannie Mae would have taken the same adverse actions, as Hall had indicated and contemplated in

11

November 2008 – i.e. before the protected activity – that Fordham would likely receive a low performance rating and may be provided with a memorandum of concern for attendance and tardiness issues.
\*\*\*

Most compelling is the timeline of events concerning Fannie Mae's contemplation and initiation of administrative leave and termination measures in relation to Fordham's protected activities and Fannie Mae's knowledge of those protected activities.
\*\*\*

Although Hall had been aware of the *December II* protected activity since December 2008, Hall had no input and was not otherwise consulted concerning administrative leave and termination, and no one at Fannie Mae other than Hall was aware of the *December II* protected activity at the time administrative leave and termination was being actively considered prior to April 23, 2009. The fact that Fordham's termination did not occur until almost three months after being placed on administrative leave does not lessen the high probability that she would have been terminated in the absence of her protected activities. As Slaughter credibly testified, Fordham was placed on administrative leave, in part, to allow for the review of documentation relating to attendance, and the reason for the delay was due to the fact that Slaughter was transitioning to a new position, had other job responsibilities, and did not prioritize the action involving Fordham.
\*\*\*

Accordingly, I find that Fannie Mae has established by clear and convincing evidence that it would have taken the same adverse actions in the absence of Fordham's protected activities.

Against the above unfavorable fact findings by the third ALJ derived solely from reviewing the factual record of the first ALJ,[1] these favorable facts were found by the 2014 ARB [JA 0166-JA 0168]:

---

[1] The law of this case established the facts from the ARB decision (pp. 6-8) [JA 0166-JA 0168] which are no longer subject to modification, contradiction or inconsistency on this petition for review.

12

By close of business on April 21, Bahr had decided, after consultation with Slaughter and Patricia Black (to whom Bahr reported), to initiate proceedings terminating Fordham's employment due to unsatisfactory performance and attendance issues. Working with Slaughter, Bahr began preparing the necessary documents, including drafting an employment termination request memorandum. D. & O. at 103.

The afternoon of April 23, 2009, Fordham submitted a project status report to Gabbay, copied to Hall, in which she asserted that they were missing necessary documentation, that it did not appear that work had been performed in 2008 to document IT Application Controls to support the intended procedure, and that SOX Technology needed to address some severe information gaps. Fordham also stated that Fannie Mae's methodology did not test at a sufficient level to gain the assurance it needed for system specific IT Application Controls which, in turn, had a direct impact on Fannie Mae's financial statements. That evening, Fordham faxed a complaint to the Securities and Exchange Commission (which she supplemented with documentation on May 19, 2009), in which she asserted, among other things, that Fannie Mae did not have Risk and Control Activities documented for its financially significant applications. At the time of Fordham's filing of the SEC complaint no one at Fannie Mae was aware of its submission. D. & O. at 104-105.

On Friday, April 24, Slaughter provided Bahr with a draft of the proposed termination request memorandum, addressed to Wagner, and asked for Bahr's review and comment. D. & O. at 105. The memorandum, dated April 24, 2009, and captioned "Request for Termination for Edna Fordham," was addressed from Bahr to Chief Audit Executive Wagner, Fannie Mae's Chief Audit Executive. In the memorandum Bahr stated: "I am requesting your approval to terminate Edna Fordham's employment from the Internal Audit department." Exhibit JX 116. The memorandum indicated that they were "working through performance and attendance issues with Fordham," but that she "continued to dispute her performance review" and had repeatedly violated the company's attendance policy "through her excessive and unauthorized absenteeism." *Id.* The memorandum concluded by requesting Wagner's approval, stating: "Human Resources [Slaughter], Legal, and Compliance and Ethics are aware of this request and approve of this action to terminate Edna Fordham.

If you agree with this action, please provide your approval as well."
*Id.* Bahr informed Slaughter that she was fine with the draft,
whereupon Slaughter indicated that she was working with Fannie
Mae's legal department to tighten the memorandum, and proposed
that Bahr meet with her on Monday, April 27, to finalize the
document. D. & O. at 105; Exhibit JX 115.

On Sunday, April 26, Fordham filed a complaint by e-mail with the
Federal Housing Finance Agency (FHFA) (which she subsequently
supplemented), in which she alleged that Fannie Mae had deliberately
withheld information from its board of directors and regulators
regarding the true state of its IT Application environment by
downplaying issues and indicating that they are relying on
compensating controls to support Financial Reporting Systems. No
one at Fannie Mae was aware of Fordham's complaint to the FHFA at
the time of its submission. D. & O. at 105-106.

Fannie Mae became aware of Fordham's SEC and FHFA complaints
on April 27, 2009, when Fordham informed Slaughter and Fischman
(an investigator with Fannie-Mae's Compliance and Ethics
Department) that she was reporting to the SEC and FHFA her
concerns that management was deliberately withholding critical
information from the company's Board of Directors and Regulators.
Concurrently, Fordham provided Fischman and Slaughter with a copy
of the accountability survey comments [JA 1272] she had
anonymously submitted to Fannie Mae management the first of
December 2008. D. & O. at 78, 106-107.

On April 28, 2009, Fordham filed a complaint with OSHA, alleging
employment retaliation because she engaged in SOX-protected
whistleblower activity, *i.e*., for having reported, internally and to
federal agencies, SOX violations by Fannie Mae. Fannie Mae did not
learn of the OSHA complaint until May 13, 2009, when OSHA
informed Fannie Mae of the complaint. D. & O. at 106-107, 109.

The proposed Monday meeting of Bahr and Slaughter did not occur.
Instead, on Wednesday, April 29, Slaughter and Veith (also with
Human Resources) met with Fordham. Slaughter informed Fordham,
among other things, that they were considering terminating her
employment, but wanted to gather more data to make sure that what
they had was sufficient and fair. Slaughter informed Fordham that as

a consequence they were placing her on administrative leave with pay while they reviewed the documentation. She explained that the action was *not* based on Fordham's performance, but on her violation of Fannie Mae's attendance policy. Slaughter also informed Fordham that her employment was *not* at that time being terminated, and that she would let Fordham know when a final decision was made. D. & O. at 108.

Having turned Fordham's termination over to Slaughter on April 24th, or at the latest on April 27th, and under the impression that Fordham's employment would be terminated when Slaughter met with her, Bahr was not aware until later, of Slaughter's decision to place Fordham on administrative leave on April 29, 2009. D. & O. at 108.

Fannie Mae subsequently terminated Fordham's employment effective July 17, 2009, when Fordham received correspondence dated that same day and signed by Slaughter. Contrary to the explanation Slaughter provided Fordham at their meeting on April 29th, Slaughter's letter informed Fordham that Fannie Mae "had determined to terminate your employment based upon your unacceptable performance, conduct, and attendance issues." Slaughter recounted in the correspondence that during the April 29 meeting, "I also shared with you that I had planned on terminating your employment the previous week" but that because of the concerns Fordham had raised in her complaints, she had placed Fordham on administrative leave pending her review of Fordham's concerns. Slaughter indicated that "[a]lthough I intended to address this issue earlier," her review had been delayed "due to my transition into a new position" with Fannie Mae. Slaughter concluded by stating:

Nevertheless, I have retained the responsibility for this matter and I have now completed my review of the underlying documentation supporting your termination. I have not found any information that would cause Fannie Mae to reconsider its earlier decision to terminate its employment relationship with you. Accordingly, your employment with Fannie Mae is terminated effective Friday, July 17, 2009. Exhibit JX 170*; see* D. & O. at 110.

And from the 2014 ARB at pp. 13-14 [JA 0173-JA 0174], the ultimate fact

conclusions governing remand were:

15

The substantial evidence of record does not support the ALJ's finding that the decision to terminate Fordham's employment and the decision to place Fordham on administrative leave occurred prior to her protected activities on April 23, 26, and 27, 2009.  While the evidence of record supports the finding that Bahr decided to initiate the employment termination process prior to Fordham's protected activities of April 23-27, the substantial evidence of record does not support a finding that Bahr's decision constituted Fannie Mae's final decision.  Indeed, the ALJ's own factual findings contradict her conclusion that the decision to terminate Fordham's employment was made prior to Fordham's protected activity.

As previously noted, the ALJ found that Bahr had decided as of April 21st that Fordham's employment should be terminated.  D. & O. at 103.  It is clear from the record, however, that Bahr was not authorized to effect a final decision on behalf of Fannie Mae with respect to Fordham's termination.  Instead, upon deciding that Fordham's employment should be terminated, Bahr began working with Slaughter to draft an employment termination memorandum in which Senior Vice President Wagner's approval to terminate Fordham's employment was requested. D. & O. at 103, 105; JX 116.  The drafting of that memorandum was not completed until Friday, April 24. D. & O. at 105.  Even then, however, Slaughter indicated that Fannie Mae's legal department had yet to sign off on the memorandum, and proposed to Bahr that they meet on Monday, April 27, to finalize the document.  Id.  The Monday meeting never took place.  Instead, as the ALJ found, when Slaughter met with Fordham on Wednesday, April 29, she informed Fordham that they were in the process of making a decision to terminate her employment, and that in the interim she was placing Fordham on administrative leave.  Id. at 108.  Slaughter informed Fordham that Fannie Mae was not terminating her employment at that time and that she would let Fordham know when a final decision was made. Significantly, and as previously noted, the ALJ found that after Bahr turned the matter over to Slaughter on April 24th, Bahr was no longer involved with Fordham's employment termination.  Indeed, the ALJ found that Bahr was not aware of Slaughter's decision to place Fordham on administrative leave and delay a decision regarding her employment termination until later, after Slaughter's meeting with Fordham on the 29th.  Id.

## V. SUMMARY OF THE ARGUMENT

Petitioner's contentions are as follows:

(1) The 2014 ARB [JA 0161] restricted the third ALJ to a set of facts that neither the third ALJ [JA 0216] nor the 2021 ARB [JA 0244] had authority or discretion to not accept.  Nor did either the 2021 ARB or the third ALJ purport to not accept the 2014 fact findings.  If the 2021 ARB decided it would not follow the 2014 ARB fact findings, it was required to explain that decision with sufficient particularity to allow this Court's review.  Under the law of the case doctrine, only limited fact findings and legal conclusions were even needed to adjudicate this petition.[2]

(2) The 2014 ARB's reversal of the 2012 ALJ findings and conclusion were binding on the 2021 ALJ and ARB: Fannie Mae's decisions to (a) place Petitioner on administrative leave and (b) then terminate her were made *after* her latest and most significant protected activity, *not before* it.  The record shows that the administrative leave and termination decisions were made by Respondent's in-house legal counsel, who were aware of said protected activity.  The 2021 ALJ and ARB failed to even acknowledge this fact and the 2014 ARB's articulation of it.

(3) The following 2021 ALJ finding [JA 0221] was binding on the 2021

---

[2] There is no provision in the DOL regulations or case law that allow a second ALJ to conduct a record review and make fact findings binding on the ARB.

ARB: Petitioner "proved that her latest protected activity was a contributing factor in the administrative leave and termination decisions".

(4) The record lacks substantial evidence to uphold the third ALJ's conclusion that despite Complainant proving contributing factor, clear and convincing evidence had been submitted sustaining Fannie Mae's decisions for administrative leave and termination as adverse actions that would have been made despite the protected activity.

(5) The first ALJ's adjudicated erroneous finding of a complete absence of contributing factor necessarily tainted her gratuitous findings and conclusions that Respondent had proven its same decision defense by clear and convincing evidence. The 2014 ARB decision (p.12) [JA 0172] made it clear that *the only reason the ALJ found Complainant had not proven contributing factor* was because of the *erroneous fact finding* that the decision to put her on leave and terminate her was made prior to April 23rd:

> Regarding Fordham's placement on administrative leave on April 29, 2009, and the subsequent termination of her employment, the ALJ acknowledged that the temporal proximity of the personnel actions to the protected activity in which Fordham engaged between April 23 and April 27, 2009, of which Bahr and/or Slaughter were aware, constituted circumstantial evidence of causation. However, because the ALJ found that Fannie Mae (per Bahr) had decided prior to the protected activity to terminate Fordham's employment for legitimate, non-retaliatory reasons, the ALJ held that Fordham failed to establish that her protected activity was a contributing factor in the decisions placing her on administrative leave and terminating her employment. D. & O. at 125-127.

Once the 2014 ARB reversed this erroneous 2012 finding of fact, all other fact

findings on contributing factor and affirmative defense were tainted.

## ARGUMENT

## VI. THE STANDARDS OF JUDICIAL REVIEW APPLICABLE TO THE UNIQUE AND TROUBLED HISTORY OF THIS CASE JUSTIFY WITHHOLDING TYPICAL DEFERENCE TO THE AGENCY DECISIONMAKING

### A. Standard of Review in this Court:

This Court reviews final ARB orders under the standard set by the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Under that

standard, this Court "may only disturb the ARB's decision if it was 'arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.'"

*Welch v. Chao,* 536 F.3d 269, 275-76 (4th Cir. 2008). However, as described

below, the standard of review is heightened because the Court must factor in the

heightened proof standard of clear and convincing evidence.

The APA review standards are part of an administrative law regime built on

deference, but "that deference is not to be a device that emasculates the

significance of judicial review."[3] *Securities Industry Ass'n v. Board of Governors*

---

[3] The standard of review provided by the APA is whether the ALJ's findings, as affirmed by the ARB, are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence in a case . . . otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(A), (E). Substantial evidence is defined as ". . . evidence which a reasoning mind would accept as sufficient to support a particular

*of Federal Reserve System*, 468 U.S. 137, 142-143 (1984).  That deference must be based on sound legal principles and reasonable minds cannot accord that deference if:  (a) where, as here, the case has languished in the DOL for nearly a decade; and (b) where, as here, the third ALJ, who never took any evidence and authored the final order adopted by the second ARB, did so based solely on his review of a record made by another ALJ and three ARB judges; and (c) where, as here, the third ALJ did not address clearly mandated fact issues by the first ARB in its remand to the second ALJ (who did nothing more than order post-remand briefs that he never acted upon); and (d) where, as here, the first ALJ's decision was filled with legal error causing it to be broadly reversed and vacated by the first ARB.

This Court should reduce agency deference in this case to the effective level of *de novo* review of the fact record, as it already does as to both legal issues and

_____

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. *T-Mobile South, LLC*, v. *Roswell*, 574 U. S. 293, (2015), and *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "After all, what in the world is a "scintilla?" *** But dating back to the nineteenth century, courts have struggled with the 'distinction between what is a scintilla' and what is not. *** Recognizing this difficulty, current South Carolina Supreme Court Justice John C. Few once remarked, in jest, that 'scintilla is Latin for 'whatever a judge wants it to mean.'" *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Scintilla to the reasonable mind, however, has meaning because the judge is schooled in the "term of art" and brings judicial experience, common sense, and respect for the statute under review.

"applications of law to facts." *Rawl v. United States*, 778 F.2d 1009, 1014 (4th Cir. 1985), *cert. denied*, 479 U.S. 814, 93 L. Ed. 2d 25, 107 S. Ct. 67 (1986), cited in *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 334 (4th Cir. 1996). The administrative record before this Court cannot inspire confidence in its adequacy. "This court has observed that '*de novo* review is appropriate only in special circumstances where agency fact finding procedures are inadequate in an adjudicatory proceeding'***." *United States v. Holcomb*, 651 F.2d 231, 236 (4th Cir. 1981), citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). *See also Va. Agric. Growers Ass'n v. Donovan*, 774 F.2d 89, 92-93 (4th Cir. 1985).  So too, this Court can "owe no deference to the Board's conclusion where, as here, 'the Board fails to adequately explain its reasoning, or where the Board leaves critical gaps in its reasoning'." *Rav Truck & Trailer Repairs v. NLRB*, 997 F.3d 314, 328 (D.C. Cir. 2021).

## B. <u>This Court's Review of Fact Findings Depends on the Degree of ALJ Legal Error and Lapses of Adjudicatory Duties on the Issues:</u>

The first ALJ's fact findings are, as a matter of law, unreliable based on numerous and manifest errors of law misguiding how the facts were to be used in constructing causation fact findings.  As the Supreme Court put it in *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 717 (1983), [w]e cannot be certain that its findings of fact in favor of the Postal Service were not influenced by its mistaken view of the law."  Since "findings of fact may often be (to what extent, in

a particular case, cannot be known) influenced by what the finder is looking for",

any "perspective framed by an erroneous legal standard cannot plausibly be

expected to furnish the basis for correct conclusions". *Rogers v. Richmond*, 365

U.S. 534, 547 (1961). *See also Middle E. Broad. Networks, Inc. v. MBI Glob.,*

*LLC*, 689 F. App'x 155, 160 (4th Cir. 2017).

    *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) reiterated that "it is the

duty of the ALJ *** to resolve conflicts in the evidence.").  That duty was not

discharged by the third ALJ because he did not address specific fact issues

remanded by the first ARB.  Nor did the third ALJ "explicitly indicate[] the weight

given to all of the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th

Cir. 1984).  Yet, "unless the [ALJ] has analyzed all evidence and has sufficiently

explained the weight he has given to obviously probative exhibits, to say that his

decision is supported by substantial evidence approaches an abdication of the

court's duty to scrutinize the record as a whole to determine whether the

conclusions reached are rational.'" *Id.* at 236.

    The presumptive starting point in deciding whether the 2014 ARB applied the

proper standard of review is that the "ARB will review the factual determinations

of the ALJ under the substantial evidence standard" prescribed by 29 C.F.R.

1980.110(b). "Substantial evidence means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Luder v. Continental*

*Airlines, Inc*., ARB CASE NO. 10-026, 2012 DOL Ad. Rev. Bd. LEXIS 11 (DOL

Ad. Rev. Bd. 2012).  However, the "reasonable mind" of an ALJ in this context

presumes that mind is evaluating facts, inferences, relevance and materiality, based

on a correct understanding of the law.  A judge who was ill-informed on a

controlling legal rule cannot be presumed to have made reliable fact findings in

support of a legal proposition that she did not properly comprehend.  Thus, "where

the recommended decision is marked by error so fundamental[,] its fact findings

are inherently unreliable". *Salata v. City Concrete, LLC*, ARB CASE NOS. 08-

101, 2011 DOL Ad. Rev. Bd. LEXIS 88 (DOL Ad. Rev. Bd. 2011).  Because the

ARB's role is "not simply rubber-stamping agency factfinding", *Menendez v.*

*Halliburton, Inc*., ARB CASE NOS. 09-002, 2011 DOL Ad. Rev. Bd. LEXIS 83,

17-18 (DOL Ad. Rev. Bd. 2011), it should not accept an ALJ's factfindings on the

same decision defense when their understanding of the controlling law was clearly

erroneous on the face of her decision.  Thus, where the ARB determines the

substantial evidence standard cannot fairly be applied to error-induced fact-

findings, the Board should revert to its pre-1980.110(b) "plenary power to review

an ALJ's factual and legal conclusions de novo", *Baiju v. Fifth Avenue Committee*,

ARB CASE NO. 10-094; 2012 DOL Ad. Rev. Bd. LEXIS 33 (DOL Ad. Rev. Bd.

2012).[4]

---

[4] *Baiju v. Fifth Avenue Committee*, ARB CASE NO. 10-094, 2012 DOL Ad. Rev.

The 2021 ALJ failed to follow the instructions for remand as stated in the

ARB's mandate (p. 36) [JA 0196] and explained in its order (p.15) [JA 0176] as

follows:

> Having concluded that substantial evidence does not support the
> ALJ's finding that Fannie Mae's decision to terminate Fordham's
> employment was made prior to her protected activities of April 23-27,
> remand to the ALJ is required for a determination, consistent with the
> analysis required by this decision (per discussion, *infra*), of whether
> Fordham's SOX whistleblower protected activities of April 23-27,
> any or all, were a contributing factor in Slaughter's decision placing
> Fordham on administrative leave and in the subsequent termination of
> her employment on July 17, 2009. If the ALJ finds upon remand that
> the protected activity was a contributing factor, the ALJ must then
> determine whether Fannie Mae's evidence clearly and convincingly
> establishes that it would have taken the same personnel action even if
> Fordham had not engaged in protected activity.

The remand had elaborated how unlikely it is that the record can support a

conclusion that Petitioner *had not proven* causation, since Respondent's

explanations were muddled, inconsistent, and in the hands of senior management

and lawyers simultaneously considering both the SOX allegations and the adverse

actions against Complainant:

> In reconsidering the causation issue, the ALJ should address any
> significant factual conflicts and/or ambiguities in the record, including

---

Bd. LEXIS 33 (DOL Ad. Rev. Bd. 2012) held: "The Administrative Review Board
has jurisdiction to review the ALJ's decision pursuant to 8 U.S.C.A. § 1182(n)(2)
and 20 C.F.R. § 655.845. Under the Administrative Procedure Act, the ARB, as the
Secretary of Labor's designee, acts with "all the powers [the Secretary] would have
in making the initial decision . . . ." The ARB has plenary power to review an
ALJ's factual and legal conclusions de novo."

but not necessarily limited to: (1) Slaughter's statement to Fordham on April 29, 2009, that she was *not at that time being terminated*, (2) the impact, if any, of the *investigation Fannie Mae initiated into Fordham's allegations of SOX violations at approximately the same time that it placed Fordham on administrative leave*, and (3) *who else in addition to Bahr and Slaughter was involved*, and to what degree and in what role, in the termination decision since the record clearly shows that others such as Jackie Wagner (to whom Bahr sent a memorandum dated April 24, 2009, requesting approval to terminate Fordham's employment), *and Fannie Mae's Legal Department (who advised Slaughter to "tighten up" the memo to Wagner) appear to have been involved.*

*Fordham Remand*, at p. 15, note 19 [JA 0175]. (Emphasis added). Moreover, the 2014 ARB held that should the ALJ make that conclusion, the ARB's mandate requires the ALJ on remand to give detailed explanations:

> Additionally, should the ALJ upon remand again credit Slaughter's testimony that her change in duties after April 29, 2009, caused an almost three-month delay in finalizing the termination letter, and that this delay is of relevance, ***the ALJ should expressly provide findings as to how the ALJ credits Slaughter's testimony***. It may be that the record does not permit the ALJ to resolve some of these issues, but if the ALJ's decision on remand results in another appeal to the ARB, the Board needs to understand how the ALJ weighed these factual ambiguities and/or gaps in the evidence in deciding the causation question.

*Id*. All of this factual inconsistency, indeed implausibility, should have been discussed and applied by the 2021 ALJ and ARB as to the clear and convincing defense. But neither did.

## C. **This Court and the ARB May Defer Only to Credibility Findings Expressly Based on Witness Demeanor, which the Third ALJ Could not Make in this Case:**

As explained in *Shively,* at 989 (4th Cir. 1984), the Court defers to an ALJ

because "he had the opportunity to observe the demeanor and to determine the

credibility of the claimant".  The third ALJ here took no such opportunity. *See also*

*Thomas v. Gen. Ship Repair Corp*., 585 Fed. Appx. 164, 164-165 (4th Cir. 2014).

The ARB will "generally defer to an ALJ's credibility findings *that rest*

*explicitly on an evaluation of the demeanor of witnesses*."  *Hall v. U.S. Army*

*Dugway Proving Ground*, ARB CASE NOS. 02-108, 2004 DOL Ad. Rev. Bd.

LEXIS 335, 79-80 (DOL Ad. Rev. Bd. 2004), citing *Svendsen v. Air Methods, Inc*.,

ARB CASE NO. 03-074, 2004 DOL Ad. Rev. Bd. LEXIS 201, 10-12 (DOL Ad.

Rev. Bd. 2004) (emphasis added).  In *Svendsen v. Air Methods, Inc*., the Board

held:

> Furthermore, as the presiding officer at hearing, the ALJ has the
> opportunity to observe the witnesses and assess their credibility based
> on those observations. Although the Board will review the evidence
> de novo and is otherwise not bound by the ALJ's credibility
> determinations, we will defer to an ALJ's credibility findings that rest
> explicitly on an evaluation of the demeanor of witnesses.

In the present case as to the credibility findings made by the first ALJ, she

found that both Complainant and Respondent's managers had "discrepancies" in

their testimony.[5] Instead of suggesting Complainant lied or perjured herself in

testimony, the first ALJ put it this way at p. 110 [JA 0139]:

> ***I find there are some portions of Complainant's testimony that are
> internally inconsistent and/or contrast with other evidence of record. I
> find that Complainant either *remembered or perceived* some events
> differently than the way in which the record as a whole supports that
> they occurred.

(Emphasis added).  The first ALJ throughout her RDO addressed some specific

credibility issues that she had with Complainant's testimony but none involved

dishonesty or intentional exaggeration, and did not rest on explicit findings based

on demeanor.  Comparisons of witness testimony with the "record as a whole" not

expressly citing demeanor is not a type of credibility finding to which the ARB is

obligated to defer.  The ARB can do that record review itself where the first ALJ is

not invoking her "opportunity to observe the witnesses".  And of course, the third

ALJ never heard any witness testimony and had no basis to accept the first ALJ's

credibility determinations.

---

[5] However, while the ALJ specified what these discrepancies were as to
Complainant, the ALJ declined or failed to identify the discrepancies by
Respondent's managers. Instead, the ALJ stated very generally at p. 112 [JA
0141]: "I found the testimony of the other witnesses to be credible and consistent,
though there were some minor discrepancies in some of the witnesses' recollection
of specific dates when events or e-mails occurred. However, I do not find that any
of these discrepancies are significant to my analysis of this case."  It should be
noted that Ms. Fordham called no witnesses who were not Fannie Mae managers.

### D. Law of the Case Doctrine Constricted Allowable Findings and Conclusions by the Third ALJ:

The ARB's law of the case doctrine rendered the 2014 ARB findings and conclusions binding on the 2021 ALJ and ARB, except for limited issues later overruled by *Palmer*. In *Stephenson v. NASA*, 2000 DOL Ad. Rev. Bd. LEXIS 78, ARB Case No. 98-025, ALJ Case No. 94-TSC-5 (2000), the ARB held:

> The law of the case doctrine "is a prudential principle that 'precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided.'" *Field v. Mans*, 157 F. 3d 35, 40 (1st Cir. 1998) (quoting *Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 770 (1st Cir. 1994)). *** The doctrine applies within administrative agencies as well. When this Board has ruled on a question of law, the law of the case doctrine binds an administrative law judge acting after a remand of the case. See, e.g., *Ruud v. Westinghouse Hanford Co*., No. 1988-ERA-33, ALJ RD&O on Remand, Dec. 8, 1988, at 5.

The ARB also made clear that the law of the case does not allow reopening the factual record unless expressly part of the ARB mandate. *Johnson v. Roadway Express, Inc*., 2002 DOL Ad. Rev. Bd. LEXIS 67, ARB Case No. 01-013, ALJ Case No. 99-STA 5 (2002).

## VII. THE ARB'S AFFIRMANCE OF THE THIRD ALJ'S FINAL DECISION AND ORDER WAS ARBITRARY, NOT BASED ON SUBSTANTIAL EVIDENCE, NOR IN ACCORDANCE WITH LAW

### A. This Court Should Apply an Enhanced Standard of Review of the Agency's Acceptance of the Clear and Convincing Evidence Same Action Defense

Any casual reformulation of the "clear and convincing evidence" heightened standard to mean a reasonable mind need only ask if there is "substantial evidence"

28

that the heightened standard was met is at risk of being a "a device that emasculates the significance of judicial review".  The words in the balance following a substantial evidence formula are not fungible-- whether those words are "preponderance of the evidence" or "clear and convincing" matters.   The Court should acknowledge the effects of these proof gradations and do justice to the elements of the claims and defenses under the whistleblower statutes.

"When the Government bears the burden of proof, as it does by clear and convincing evidence on the issue [at bar], the substantial evidence standard is "more demanding." *Ahmed v. Lynch*, 804 F.3d 237, 240 (2nd Cir. 2015), quoting *Francis v. Gonzales*, 442 F.3d 131, 138 (2d Cir. 2006).  The "Sixth and Ninth Circuits have stated that evidence may need to be more "substantial" to meet the clear and convincing standard." *Id.*   Rather, "we must find that any rational trier of fact *would be compelled to conclude* that the proof [did or] did not rise to the level of clear and convincing evidence. *Id.,* at 138-139.

**B. Because Neither the 2021 ALJ nor the 2021 ARB Engaged in Speegle, Carr or Any Other Structure Legal Analysis of the Same Action Defense, this Court's Reasonable Mind Cannot Accept the Agency Dismissal of this Case**

Any judicial review using a "reasonable mind" methodology may wish to first reflect on that mind's required attributes: judicial experience, common sense and determination to vindicate the statutory policy at stake. Thus, a "reasonable mind" could not accept the earth is flat regardless of how rich the agency record is

29

in substantial evidence that it is.  *See, Wikipedia "Flat Earth"*,

*https://en.wikipedia.org/wiki/Flat_Earth*.  A reasonable mind does not accept

unreasonable premises that may otherwise be established by "the record as a

whole".  As the Supreme Court recited the literature on point in *Califano v.*

*Goldfarb*, 430 U.S. 199, 223 (1977):

> [T]he law supposes that your wife acts under your direction. "'If the
> law supposes that,' said Mr. Bumble, squeezing his hat emphatically
> in both hands, 'the law is a ass - a idiot. If that's the eye of the law, the
> law's a bachelor; and the worst I wish the law is, that his eye may be
> opened by experience - by experience.'"

Citing C. Dickens, *The Adventures of Oliver Twist*, c. LI.  The reasonable mind is

informed by "judicial experience and common sense".  *Ashcroft v. Iqbal*, 556 U.S.

662, 679 (2009).  In that spirit, the Fourth Circuit applies the three *Speegle* factors

to the "same action" or "same decision" affirmative defense.[6]  Although there are

only three substantive factors, each of them is subject to four qualitative criteria:

(1) A reasonable mind is the lens; (2) filtering *each factor* by clear and convincing

evidence is the measure; (3) assessing what adverse acts the employer "would have

done" rather than "could" have done is the reality check; and (4) at the point in

---

[6] *Smith v. DOL*, 674 Fed. Appx. 309, 315 (4th Cir. 2017), applying *Speegle v.*
*Stone & Webster Constr., Inc*., ARB Case No. 13-074, 2014 DOL Ad. Rev. Bd.
LEXIS 28, 2014 WL 1758321, at *7 (Dep't of Labor Admin. Review Bd. Apr. 25,
2014).

time the adverse act was actually done is the temporal plain.[7]  The three *Speegle*

factors are: (1) Whether the evidence is "clear" and "convincing" regarding the

independent significance *of the non-protected activity*;[8] (2) *the extent of the*

_____

[7] Unclear evidence that is convincing is not adequate, nor is clear evidence that is not highly convincing. *It must be both clear and convincing* because the statute says so, literally.  The clear and convincing proof burden "requires the employer to prove that it 'would have', not simply that it 'could have', made the same adverse employment decision absent the protected activity." *Speegle*, 2014 DOL Ad. Rev. Bd. LEXIS 28, 2014 WL 1758321, at *7; *see also Bobreski v. J. Givoo Consultants, Inc.*, ARB No. 13-001, ALJ No. 2008-ERA-003, 2014 DOL Ad. Rev. Bd. LEXIS 61, 2014 WL 4389968, at *10 (ARB Aug. 29, 2014)(describing the affirmative defense as "the same decision defense"). *See also DeFrancesco v. Union R.R. Co.*, ARB No. 13-057, ALJ No. 2009-FRS-009, 2015 DOL Ad. Rev. Bd. LEXIS 51, 2015 WL 5781070, at *6 (ARB Sept. 30, 2015) (applying the *Speegle* factors to a "same decision" affirmative defense in a Federal Rail Safety Act case). *See also Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1298 (7th Cir. 1992) (requiring "proof that the employer would have fired the employee, not simply that it could have fired him"); *Foster v. University of Ark.*, 938 F.2d 111, 114 (8th Cir. 1991) ("'[C]ould have been fired' is not the same as 'would have been fired'.")

[8] Any suggestion that Speegle factor one "is just one of the factors" is clearly erroneous since it would conflict with the statutory mandate that the defense must be proven by clear and convincing evidence.  The SOX defense has four elements: the employer (1) *would have* taken (2) the *same action* (3) at the *same time* (4) in the *absence of the protected activity*.  This defense is raised only after the protected activity has been proven to be a "contributing factor" to what has already been proven to be an adverse action.  The defense has already proven the taint of unlawfulness, and the burden is on the employer to escape responsibility for that taint by heightened proof.  Where a statute imposes a heightened proof standard on a claim or defense, that heightened proof requirement applies to *each element* of the claim or defense. *See Hurst v. Florida*, 577 U.S. 92, 97 (2016) ("each element of a crime be proved to a jury beyond a reasonable doubt"), *Covarrubias v. CitiMortgage, Inc*., 623 F. App'x 592, 594 (4th Cir. 2015) ("bears the burden of proving each element by clear and convincing evidence.")

*evidence* showing whether the employer would have made the same adverse decision; and (3) any *facts that would have changed* had the protected activity not occurred. *Smith v. DOL*, 674 Fed. Appx. 309, 315 (4th Cir. 2017). This standard "intentionally was designed to be demanding in nature". *Smith v. DOL*, 674 Fed. Appx. 309, 315 (4th Cir. 2017), citing *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997) ("for employers, this is a tough standard, and not by accident."). The heart of the process is for the ALJ to consider "the hypothetical premise that the employee never engaged in the protected activity" and see if remaining evidence supports that the employer "would have" done exactly *what it did when it did*, not *what it might have done at a different time*. Thus, this Court must ask as to Ms. Fordham:

> (1) What evidence is there that supervisors Slaughter and Barr would have disconnected Ms. Fordham from computer access and whisked her offsite on involuntary leave had she not just told them she filed whistleblower complaints with federal agencies and was to be debriefed by Fannie Mae investigators the next day? Could a reasonable mind consider that evidence to be clear and convincing?

> (2) What evidence is there that Slaughter and Barr would have unplugged and whisked off Ms. Fordham as they did on that date at that meeting based only on time/attendance and PowerPoint deficits?

---

*Bank of Am., N.A. v. Sands*, 488 F. App'x 704, 708 (4th Cir. 2012) ("constructive fraud must prove each element of the claim by clear and convincing evidence"), and *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) ("the defendant must establish by clear and convincing evidence each element of the defense", cited by *Gart v. Logitech, Inc*., 254 F. Supp. 2d 1119, 1124 (C.D. Cal. 2003).)

Could a reasonable mind consider that evidence to be clear and convincing?

(3) What evidence is there that Slaughter and Barr would have sent the file to "Legal" had the federal whistleblower filings not been made by Ms. Fordham? Could a reasonable mind consider that evidence to be clear and convincing?

(4) What evidence is there that had Fannie Mae "Legal" not been reviewing the federal whistleblower filings that Ms. Fordham would have been in a three-month limbo of involuntary paid leave? Could a reasonable mind consider that evidence to be clear and convincing?

The most "significant facts that would disappear in the absence of protected activity" is the sudden unplugging and whisking-off of Ms. Fordham.

Fannie Mae did not put clear and convincing evidence in the record that it would have taken those acts against her once Ms. Fordham's protected activity is deducted from the sum of evidence. Maybe Fannie Mae could have, or should have taken these abrupt steps, but clear and convincing evidence does not exist in the record showing the company would have done what it did on the date it did. *Smith v. DOL*, *infra*. A reasonable mind must first itself perceive the clear and convincing failure of the defense. Once it does, that mind must then ask itself: how could another reasonable person not perceive the defense had failed?

C. **Administrative Leave (aka Administrative Suspension):**

In addition to being fatal to the first ALJ's contributing factor analysis, Bahr's testimony that HR vowed to administratively suspend Fordham if she again threated to pursue her legal rights and remedies should have been found to be fatal

to Fannie Mae's clear and convincing defense. As Bahr testified, HR warned swift

administrative suspension if Fordham "continued with the emails to the

management team with the suing and the threats and the allegations", and HR

made good on that warning on April 29th eight days after she sent JA 1024 on April

21st to Gabbay and Bahr stating:

> Basically, what I'm stating is that I would like to have the assurance
> that you are dealing with me fairly and not deliberately *withholding*
> *information necessary to perform this [ARQ] project correctly*, in
> order to set me up for failure. I truly hope, I am wrong, but if this is
> the case and it continues to happen, *I will report this incident to*
> *Investigations* and EEOC.

(Emphasis added).  Fordham sent this email at 8:47 a.m. At 9:12 a.m. Bahr

forwarded it to Slaughter asking "does this count as another one of 'those' emails

that you had asked Edna not to send?" (JA 1025).  The next day Slaughter and

Bahr were working up a termination request until 7:49 p.m. on a Friday night. As a

matter of law, it is impossible for Fannie Mae on the full record to sustain a clear

and convincing defense.  Slaughter testified she pretty much did what Legal

wanted in inflicting the administrative suspension and computer lockout of

Fordham:

> Q When was the decision made to place her on administrative leave?
> A That was --I think it was the day of or the day before we met her
> when speaking with Legal. Q … And whose idea was it to place Ms.
> Fordham on administrative leave? A It was a combination of, you
> know, from my perspective, from the management perspective was to
> terminate, from taking counsel and *taking advice from our Legal*
> *Department in terms of things that had happened and what they would*

> *like us to do*, that was the *best, to go on administrative leave to be*
> *able to make sure that we are clear about the decision*. ***A The
> *decision had been made to terminate* and with counsel it was decided,
> "All right. *To do due diligence, let's do administrative leave*."

(JA 2494, emphasis added). And that's all Slaughter knew, Legal told her what to

do calling it some cryptic "due diligence", and due to invocation of attorney-client

privilege, there is no more evidence in the record on Legal's motivations.

On or about April 2, 2009, Complainant met with Darlene Slaughter to

report a hostile work environment in retaliation based on race and for Ms.

Fordham's disclosures of SOX violations. Ms. Slaughter met with Ms. Fordham on

April 3, 2009, and reported her reaction to the protected disclosures emails sent by

Ms. Fordham as:

> So then, when I saw the next email…everybody is sort of like, "Oh, my
> God; the woman is going to sue."…[9]

Ms. Slaughter then contacted Ms. Fordham's Director Stephanie Bahr about Ms.

Fordham's allegations.[10]   This management concern built during the week of April

20, 2009, when Complainant raised her SOX concerns in staff meetings and via

email to SOX Technology management.  On April 23, 2009, Complainant wrote to

her managers Mike Gabbay and Stephanie Bahr noting "serious gaps which need

---

[9] JA 1320.

[10] Slaughter Direct, Tr., 1254: 1-19 [JA 0515].

to be addressed across the board".[11]   She recorded a lack of necessary SOX

documentation and reported the additional concerns: "If we do not know specific

IT Controls Application Design, Risk and Control Activities how can we

effectively identify automated controls and proposed solutions…?"[12]

Because management was unreceptive to these concerns, on April 27, 2009,

Ms. Fordham emailed Fannie Mae's Human Resources Department via HR VP

Darlene Slaughter and Office of Compliance, Ethics and Investigations' Wendy

Fischman her concerns, and of her intent to escalate her concerns to external

regulators if necessary.[13] Ms. Fordham wrote:

> …I have made the decision to report specific concerns to our
> regulators FHFA and SEC regarding our Information Technology and
> Internal Controls in the SOX Technology Department… The work I
> perform in the SOX Technology Department has a direct impact on
> FHFA and SEC.  It is my opinion that the Management of the SOX
> Technology Department has …deliberately withheld information from
> Fannie Mae's Board of Directors and Regulators by downplaying the
> actual state of Fannie Mae's control environment surrounding
> significant IT Application Controls which had a direct impact on the
> Financial Statements.
>
> I believe my actions were necessary because I have fully exhausted
> the resources within Fannie Mae to escalate my concerns and to have
> them addressed properly… Due to the fact the nature of my complaint
> involves Sarbanes Oxley and that Fannie Mae is currently under

---

[11] JA 1305.

[12] JA 1305.

[13] JA 1318.

conservatorship, I am seeking protection under all and any
Whistleblower laws.14

That same day, the Office of Compliance, Ethics and Investigations informed Ms.

Fordham of its interest in discussing in detail her irregularities and fraud

allegations.15  Investigations also informed Ms. Black of Ms. Fordham's

allegations that same day.16 Ms. Fordham then immediately transmitted documents

to the Office of Compliance, Ethics and Investigations regarding her SOX

protected activity.17 Ms. Fordham wrote:

> Please find attached Bob's Accountability survey [JA 1272] where I
> specifically document my concerns with the SOX Program.  My concerns
> were discussed openly with Managers and peers since time I transferred to
> this department 2/19/08.18

At this juncture, Fannie Mae lawyers took over, considering both

Complainant's SOX allegations and administrative leave simultaneously Under

Section 9 of Fannie Mae's Code of Ethics, Fannie Mae has assigned its Office of

Compliance, Ethics and Investigations the duty of processing complaints and

---

14 JA 1318.

15 JA 1312, Fordham Direct, Tr., 116: 1-19 [JA 0288], Fischman Redirect, Tr.,
226-27 [JA 0300- JA 0301]

16 JEX #132, p. 36. [JA 1266]

17 JA 1312.

18 Fordham Dir., Tr., 116: 20-25, 117: 1 [JA 0288], Fischman Redirect, Tr., 226: 7-
15, [JA 0300- JA 0301].

disclosures from employees as to violations of law or policy, and of retaliation against the employee because she reported or raised questions about such violations. The Office of Compliance, Ethics and Investigations is charged with evaluating and investigating any allegations of misconduct or illegality and overseeing and coordinating Fannie Mae's OFHEO and FHFA regulatory reporting and examinations.[19] Fannie Mae's Chief Compliance Officer reports directly to the Chief Executive Officer and independently to the Audit Committee of the Board of Directors. The Office of Compliance, Ethics and Investigations (hereinafter "Investigations") is primarily staffed by attorneys, who typically worked in employment law prior to assuming their duties at Fannie Mae.[20]

On April 23, 2009, Ms. Fordham made initial contact with the SEC expressing concerns regarding gaps identified in the SOX Program earlier that

---

[19] JEX #140, p. 14 [JA 1288], JEX #143, p. 9 [JA 1300].

[20] The majority of ethics investigators that Fannie Mae hires are practicing attorneys, as are the supervisors and managers of the Investigations Office. (Fischman Dir., Tr., 134-136) [JA 0292- JA 0294], (Arrington Cross, Tr., 874-75) [JA 0381- JA 0382]. Vice President for Investigations Leslie Arrington was partner level lawyer at a DC law firm for ten years immediately before assuming her duties with Fannie Mae. (Arrington Cross, Tr., 856: 21-25, 857: 1-9) [JA 0377]. Her practice was employment law-related claims, including retaliation claims, and white collar criminal defense. (Arrington Cross, Tr. 865: 24-25, 866: 1-7) [JA 0380- JA 0381]. Thus, she was very familiar with the laws surrounding employment law, Title VII, False Claims Act and those types. (Arrington Cross, Tr., 866: 4-7) [JA 0381]. Similarly Fischman had been a practicing attorney with a large DC firm for seven years before joining Fannie Mae, and one of her clients was Fannie Mae. (Fischman Direct, Tr., 138: 1-25) [JA 0294].

week involving financially significant applications that processed material balances in the financial statements. Complainant did so after discussing her concerns with SOX Technology management. On April 26, 2009, Ms. Fordham initially contacted FHFA explaining her concerns related to internal control deficiencies.[21] Prior to her termination, Complainant had additional telephone contacts with FHFA on July 14 and 15, 2009.

On April 28, 2009, the day before she was placed on involuntary paid administrative leave, Ms. Fordham submitted a complaint to the U.S. Department of Labor disclosing these SOX violations and retaliation against her in the form of a hostile work environment. Ms. Fordham also made similar disclosures to the SEC and the Federal Housing Finance Agency (FHFA), and to the U.S. Department of Justice Corporate Fraud Task Force, as well as to the Federal Bureau of Investigation and Members of Congress. Managers in both the Human Resources and SOX Technology departments had knowledge of Complainant's protected activity. On April 28, 2009, the Investigations Office set up an interview with Ms. Fordham for April 30, 2009, to provide detailed information regarding those violations and retaliation.[22] Investigations identified the case as an

---

[21] Fordham Direct, Tr., 90-91 [JA 0274- JA 0275].

[22] JEX # 132, p. 2 (Fischman's notes state: "4/28/09 – Scheduled intake interview with Complainant for 4/30/09 at 11:30 a.m.") [JA 1231], Fischman Redirect, Tr., 226-27 [JA 0300-JA 0301].

"accounting matter" to be included on the "monthly Fraud, Accounting, and Misconduct Report to Internal Audit" and included on the quarterly report to the Audit Committee.[23]   Prior to this scheduled meeting, Ms. Fordham obtained from her management authorization to attend this meeting.[24] However, the meeting never occurred because the Respondent removed Complainant from the work place through involuntary paid administrative leave.

Thus, although Complainant had an interview set with Investigations on April 30, 2009, HR's VP Slaughter intervened removed her from the workplace the day before that meeting could occur. This not only removed Ms. Fordham from the workplace and her electronic access, but it served to effectively prevent Ms. Fordham from pursuing her SOX complaints internally:

> Q     And did, in fact, investigations contact you to set up an interview?
>
> A     *** we basically had a tentative appointment set for April the 30th, 2009 with investigations which I was not able to attend because they immediately [su]spended me on April the 29th before we had the opportunity to meet.
>
> Q     And when you were suspended was your access or your computer privileges, was any of that changed in any way?
>
> A     Oh, definitely.  The day that Darlene Slaughter paid her surprise visit, my system access was immediately revoked.  I was in the middle of typing a e-mail to Mike Gabbay that day.  I was allowed

---

[23] JEX #132, p. 2 [JA 1231].

[24] Fordham Direct, Tr., 89: 17-23 [JA 0273].

to come back to my desk, collect some of my personal things but the majority of which were left behind for them to go through and check to make sure I didn't have any of their property on hand. But access was stripped away. I had to give back my access card, and I was walked out the front door.

Q      And did you ever come back and access back in or badge back in?

A      I never came back on the property at that point in time, since that time.

Q      And did you ever meet with investigations after that time?

A      No.

Q      And why not?

A      Obviously, at that point when they placed me on suspension with pay, it created in my opinion a very hostile situation, and it clearly communicated to me that they were really not interested in conducting investigation. We were scheduled to meet on April the 30th. If they were really interested in my Sarbanes-Oxley complaint, they could have waited at least another day to find out the nature of my complaint before they decided to put me on administrative pay with leave. So it was clear to me they wanted me off the property. They didn't want me to have access to any information that I could eventually provide to their regulators. 25

Ms. Slaughter told Complainant that day that they would be shutting her out of the

system and Investigator Fischman confirmed that she understood as of April 29,

---

25 Fordham Direct, Tr., 116-117 [JA 0288-JA 0289]

2009, Ms. Fordham no longer had access to her Fannie Mae computer or access to her documents.[26]

Almost none of this evidence was discussed by the 2021 ALJ in concluding that the Fannie Mae met its clear and convincing evidence burden as to the administrative leave adverse action.

### D. Termination Following the Administrative Leave:

The 2021 ALJ's anemic analysis as to the administrative leave then tainted his conclusions as to the termination. On May 4, 2009, Ms. Fordham pressed Investigator Fischman over the administrative suspension taken under pretext:

> I'm assuming you have not been advised by Darlene Slaughter of HR that she placed me on Administrative Leave on Wednesday, April 29, 2009… Darlene claimed the basis for the decision was due to unauthorized leave, although I know, based on my personnel records, this was not an issue nor was it raised in the Memo of Concern dated March 3, 2009 or when I met with Darlene and Stephanie Bahr on April 15, 2009. It is my position that HR's decision is Adverse Action taken against me as a direct result of the OSHA Whistleblower complaint received. [27]

---

[26] Fischman Redirect, Tr., 225-226 [JA 0299-JA 0300], JEX #177 [JA 1320]. During her deposition, Ms. Slaughter attempted to claim she didn't think Complainant's computer access was cut off immediately, but the audio recording accompanying the transcript at JEX #177 [JA 1320] is clear from Ms. Slaughter's statements that Ms. Slaughter knew at the time she suspended Complainant that the access would be immediately shut off. (JEX #186, Slaughter, 63-64) [JA 2488-JA 2489].

[27] JEX #154, p. 2 [JA 1303].

Ms. Fordham further reported that she had not taken 6 unauthorized days of leave as management was newly claiming, and that Ms. Slaughter said she was going to investigate this allegation before making any decision.[28]

Complainant reported her protected activities to OSHA during her May 8, 2009 interview with that office.[29] On May 13, 2009, OSHA notified Fannie Mae of Complainant's April 28, 2009 complaint.[30] Prior to her termination, on May 19, 2009, Ms. Fordham provided a binder of documentation to the SEC to support her "complaint of Fraud" she "believed Fannie Mae committed based on misleading and/or omitted disclosures in the company's SEC Filings".[31] Ms. Fordham provided additional information by phone to the SEC on or about the following dates:  May 1, 4, 19, 26-27, 2009, June 4, 2009 and July 9, 2009.   Ms. Slaughter did not describe any reason why Ms. Fordham needed to be sent away from the office in order for Ms. Slaughter to review her attendance records.[32]  Finally, as the Fordham ARB found, despite Ms. Slaughter suspending Ms. Fordham solely for a

---

[28] JEX #154, p. 2 [JA 1303].

[29] Fordham Direct, Tr., 106: 16-23 [JA 0283],

[30] JEX #183, p. 98-100 [JA 2401-JA 2403].

[31] JEX #178 [JA 1606-JA 1609].

[32] JEX #177 [JA 1320].  Complainant was cordial and professional even as HR was throwing her out of the office; as she explained, she was already so stressed by management's retaliation in the workplace.

review of her attendance records, on July 19, 2009, Ms. Slaughter claimed she was

terminating Ms. Fordham for "*unacceptable performance*, *conduct,* and attendance

issues."[33]

      Almost none of this evidence was discussed by the 2021 ALJ in concluding

that the Fannie Mae met its clear and convincing evidence burden as to the

termination adverse action.

### E.  The ALJ's Conclusion on Clear and Convincing Evidence is Plainly Erroneous, and Based on Ignoring the 2014 ARB Remand Order

      If a whistleblower proves that a protected activity was a contributing factor

in an adverse action, the employer may nevertheless avoid liability if it proves by

clear and convincing evidence that it would have taken the same adverse actions in

the absence ofthe protected activities – i.e. the "same-action defense." 18 U.S.C. §

1514A(b)(2)(C); 49 U.S.C. § 42121(b)(2)(B); 29 C.F.R. § 1980.109(b). The burden

for clear and convincing evidence "rests between preponderance of the evidence

and proof beyond areasonable doubt." *Gatto v. General Utilities*, ALJ No. 2018-

STA-00003, slip op. at 4 (OALJ November 1, 2018) (citations and internal

quotation marks omitted). It "denotes a conclusive demonstration, i.e., that the

thing to be proved is highly probable or reasonably certain." *DeFrancesco v.*

*Union R.R. Co.*, ARB No. 13-057, ALJ No. 2009-FRS- 009, slip op. at 8 (ARB

---

[33] JEX #170 [JA 1319]

Sept. 30,2015). "Clear evidence means the employer has presented an unambiguous explanation for the adverse action in question. Convincing evidence is that which demonstrates a proposed fact is highly probable." *Lancaster v. Norfolk S. Ry. Co.*, ARB No. 2019-0048, ALJ No. 2018-FRS-00032, slip op. at 8 (ARB Feb.25, 2021).

Bahr's notifying managers by email that the employee Fordham will contact investigations if ARQ documentation is withheld that she needs to perform her SOX technology related internal controls review constitutes notification of intent "to provide information, cause information to be provided, or otherwise assist in an investigation" under 18 USC § 1514A(a)(1).   As Bahr testified, HR warned swift administrative suspension if Fordham "continued with the emails to the management team with the suing and the threats and the allegations". [3/19/2012 D&O P. 70, JA 0099]. And that's all Slaughter knew, Legal told her what to do calling it some cryptic "due diligence", and due to invocation of attorney-client privilege [JA 0985, 1021, 1244, 1266, 1318, and 1596] there is no more evidence in the record on Legal's motivations.  Fordham's April 27th email notifying Fannie Mae that she was going to take the concerns she had expressed to HR and Investigations to the SEC and federal regulators is the most proximate stimulus to the administrative suspension. (JEX 168) [JA 1318].  The top of that email chain is redacted by Fannie Mae Legal.

With this cryptic "due diligence" explanation from Fannie Mae lawyers who shielded themselves from further explanation and combined with HR making good on its threat to administrative suspend Fordham for further email assertion of her legal rights, Fannie Mae cannot sustain a lawful reasons defense by clear and convincing evidence. Were preponderance of the evidence the standard, sustaining the defense might have been possible, but not under clear and convincing evidence. Bahr testified unequivocally that her desire to see Fordham fired based on poor performance was rejected by HR/Legal, then proceeded solely on time and attendance-- "And at the end of the day, honestly, I didn't care much either way". (JA 0642). But the record is clear that Fordham had received no prior warning or counseling on this alleged violation, despite Slaughter testifying that Fannie Mae policy and practice requires that counseling outside of exceptional cases:

> Q And you described a process whereby HR will counsel the management team on giving the employees some counseling and perhaps giving some written notes. Can you describe why you do that process?
>
> A That process is done to ensure --to provide fairness and to give the employee an opportunity to turn the --whatever the issue is, especially around performance, to turn it around before termination.
>
> Q Are there circumstances where you don't go through any sort of a notice process or written memorandum before termination is executed?
>
> A Yes.

(JA 2552, emphasis added). The only exceptional aspect in Fordham's case giving any urgency to getting her out of the building and cutoff from computer document access was her stated intentions to go to Investigations and the SEC per her April 21st and April 27th emails. This is true for the termination as well, since Slaughter unambiguously explained in the transcript quote above that the administrative leave was the direct result of the decision to terminate. There is no need to delay justice further by having the ALJ revisit that issue given that regardless of her ruling, the question will again land with the ARB on exactly the same factual record.

Judges should honor the clear and convincing evidentiary standard prescribed by the statute to meet critical public policy goals, rather than simply pay it lip service. That evidentiary standard is reserved for only the most important cases in civil litigation. "The standard of proof utilized in an adjudication reflects a very fundamental assessment of the comparative social costs, or 'disutility' of erroneous factual determinations." *Price v. Symsek*, 988 F.2d 1187, 1192 (Fed. Cir. 1993), quoting Justice Harlan in *In re Winship*, 397 U.S. 358, 370 (1970) holding that clear and convincing evidence is a constitutionally required due process before a juvenile court detention is imposed. As recently reviewed by the ALJ in *Barrett v. E-Smart Technologies, Inc*., 2011 DOLSOX LEXIS 64, pp. 96-97,ALJ No. 2010-SOX-00031 (September 9, 2011):

> Once a complainant makes out a prima facie case of retaliatory discrimination, the burden shifts to the employer to show by clear and convincing evidence that it would have taken the adverse employment action even absent the protected activity. *** Clear and convincing evidence is a burden higher than a preponderance of the evidence and lower than the "beyond a reasonable doubt" standard. *** It requires "evidence indicating that the thing to be proved is highly probable or reasonably certain."

Citations omitted. "Clear and convincing evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable'." *Price v. Symsek, id.* at 1191(citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1983). See also, *Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 2011 U.S. Dist. LEXIS 2548 (C.D. Cal. Jan. 11, 2011), and *Donnelly Corp. v. Gentex Corp*., 913 F. Supp. 1014, 1020 (W.D. Mich. 1995). Neither the first nor third ALJ honored this standard.

## VIII.  CONCLUSION

The Petition for Review should be granted and remanded to the ARB to award remedies.  Per the first ALJ's prehearing order allowing the Complainant to submit an expert front-pay calculation should reinstatement not be ordered, and given that the ARB is in the best position to make findings regarding emotional distress, all issues of relief should remain with the ARB without remand.

Respectfully submitted,

/s/ Thad M. Guyer

_____

Thad M. Guyer (Oregon # 82144)

48

Stephani L. Ayers
T.M. GUYER AND AYERS & FRIENDS,
PC
116 Mistletoe Street
Medford, OR  97501
Tel. 206 954 1293Fax. 1 888 866 4720
thad@guyerayers.com

Of Counsel
GOVERNMENT ACCOUNTABILITY
PROJECT, INC.

Attorneys for Petitioner

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner hereby requests oral argument. The legal issues in this case regarding proper administrative review where the hearing ALJ entered no findings on the affirmative defense, the same then having been adjudicated by a successor ALJ on the cold record, present a case where oral argument could assist the Court to understand those issues.

Respectfully submitted by:

/s/ Thad M. Guyer

_____

Thad M. Guyer

## CERTIFICATE OF COMPLIANCE

1. This Opening Brief of Appellant has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, this Opening Brief of Appellant contains 12,378 words.

3. I understand that a material misrepresentation can result in the court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.


Dated: November 1, 2022

/s/ Thad M. Guyer

_____

Thad M. Guyer

# CERTIFICATE OF SERVICE

SERVED **PETITIONER'S  OPENING BRIEF** BY MAIL, and ELECTRONICALLY by ECF and Email on the 1st day of November, 2022 on all counsel of record registered on the Court's ECF service, and the following:

Mr. Damien G. Stewart                    damien_g_stewart@fanniemae.com
Fannie Mae Legal Department/Employment Practices Group
3900 Wisconsin Avenue, N.W.
Washington , D.C. 20016-2892
Attorney for Respondent

/s/  Thad M. Guyer

_____

By Thad M.  Guyer